Filed 12/16/14  P. v. Torres CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ADRIAN TORRES,<br><br>        Defendant and Appellant. | A136219<br><br>(Solano County<br>Super. Ct. No. FCR274440) |
| THE PEOPLE,<br>        Plaintiff and Respondent,<br>v.<br>RUDOLFO RAYMOND ORTEGA, JR.,<br>        Defendant and Appellant. | A136232<br><br>(Solano County<br>Super. Ct. No. FCR274439) |

This is a criminal appeal following a jury trial in which Adrian Torres (Torres) and Rudolfo Raymond Ortega, Jr., (Ortega) (together, appellants) were each found guilty of second degree murder, attempted murder, and assault with a firearm.  On appeal, they contend:  (1) the trial court violated Ortega's constitutional rights by allowing the prosecutor to question him—and comment—on his silence and failure to claim self-defense before trial; (2) the prosecutor committed misconduct by questioning Ortega and commenting on his failure to claim self-defense, by disparaging defense counsel, and by arguing in closing that what Torres told police upon arrest was inconsistent with his testimony at trial; (3) the trial court erred by excluding evidence that one of the victims who survived was subsequently found in possession of a firearm; and (4) Torres's

1

sentence of 86 years 4 months constitutes cruel and unusual punishment. We reject the contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 13, 2010, an information was filed alleging that on or about March 5, 2010, appellants and Jesus Antonio Vidrio (Vidrio) committed: (1) murder (Pen. Code[1], § 187, subd. (a), count 1); attempted murder (§§ 664/187, subd. (a), count 2); and assault with a semiautomatic firearm (§ 245, subd. (b), count 3). The information alleged as to counts one and two that appellants and Vidrio personally and intentionally discharged a firearm that proximately caused great bodily injury or death (§ 12022.53, subd. (d)) and that the offenses were committed for the benefit—and at the direction—of a criminal street gang (§ 186.22, subd. (b)(1)). The information charged as to count three that appellants personally used a firearm (§§ 12022.5, subds. (a), (d), 1192.7, subd. (c)). The fourth count charged Vidrio alone with evading an officer with willful disregard while driving (Veh. Code, § 2800.2, subd. (a)), and included a criminal street gang allegation (§ 186.22, subd. (b)(1)).

After a jury trial, the jury acquitted appellants of first degree murder and convicted them of second degree murder, attempted murder, and assault with a firearm. The jury found true the weapons allegations in counts one to three but found the gang allegations untrue. Vidrio was acquitted of all crimes in counts one to three but was convicted in count four for evading an officer with willful disregard while driving. Vidrio was sentenced to the upper term of three years. The trial court sentenced Ortega to a total determinate term of 21 years and four months and a total indeterminate term of 65 years to life. In count one, Ortega received 15 years to life for the murder plus 25 years to life for the gun use. In count two, he received two years and four months (one-third the middle term) for the attempted murder and 25 years to life for the gun use. In count three, he received the upper term of nine years plus 10 years for the gun use. He received

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

total credits of 881 days.  The trial court imposed the same sentence on Torres and awarded him total credits of 882 days.

The information was based on an incident that occurred on March 5, 2010.  That afternoon, then-17-year-old Humberto "Beto" Padilla (Padilla) and his mother's boyfriend, Alton Johnson, went to Alex Guizar's grandmother's house "down the street" so that Padilla and Guizar "could straighten out whatever differences they were having in school."  Padilla did not go there intending to fight Guizar and Johnson did not think there would be a fight.  Johnson was a longtime friend of Guizar's family and had known Guizar for Guizar's entire life.  Johnson accompanied Padilla to the grandmother's house "[j]ust to make sure that everything goes okay."  At some point, the discussion between Padilla and Guizar turned into a one-on-one fist fight between them that "looked even" to Johnson.  Padilla and Johnson returned home, and later that day, Padilla went out.  Some testimony was presented that Padilla was a Norteño gang associate, and that the fight was over Guizar having contact with relatives who were Sureños.[2]

At about 6:30 p.m. that evening, Padilla was with K.W. and R.E.,[3] standing outside of a friend's house, waiting for the friend to finish showering and get ready so they could all go out together.  As they waited, they had a discussion about the fight Padilla had with Guizar earlier that day.  Padilla was upset because he had called K.W. and a friend to come and back him up in the fight, but the two had failed to get there in time.

K.W. then saw two men walk by.  The individuals, who were wearing black clothing and beanies, seemed friendly, but Padilla and R.E. appeared to be suspicious of them because they did not recognize them.  R.E. said, "Yo, who's that?  We don't know them," or may have possibly said, "They're not from here."  As the two men approached,

---

[2]Although a great deal of evidence was presented at trial relating to the gang charges, we omit most of that evidence from our facts because the jury found the gang allegations untrue.

[3]We will identify the living victims who were minors by their initials to protect their anonymity.

3

Padilla and R.E., who had been sitting down, got up to greet them. The bigger of the two men[4] asked, "Hey, you all Norte?" or "you all north bay?"[5] R.E. replied, "Yeah, Rocky Hill Posse"—a reference K.H. did not understand, but was a reference to the Norteño gang—and then "dapped" the man's hand as a form of handshake. At that point, the two men stepped back, each pulled out a handgun, and began firing at Padilla, R.E., and K.W.

When asked whether he saw Padilla quickly pull his hand out of his pocket, K.H. testified that he "might have," but that he did not see this occur. K.H. testified that for the most part the shooters were aiming at Padilla, although some shots hit the side of a house and one hit R.E. Padilla was shot in the upper left side of his back and his right buttock, and died at the hospital from gunshot wounds. Both bullets exited the body and it was not possible to tell the caliber of the bullets that caused the wounds. R.E., who was 15 years old at the time, was shot in the buttock. R.E. suffered a puncture wound in his pelvis and a wound on his buttock, consistent with gunshot wounds. He was hospitalized for five days and underwent surgery in which part of his bowel was removed and a hole in his ureter, a tube connecting the kidney to the bladder, was repaired.

K.H. testified that he was not armed that day and did not see either Padilla or R.E. with any weapons. He testified that he ran from the scene with R.E. after the shooting and helped him to R.E.'s grandmother's house. At that point, R.E. said, "I'll be all right. Get out of here." As K.W. went back toward the scene of the shooting to see how Padilla was doing, he saw that police and medical personnel had already arrived. K.W. went home because he did not want to be involved with the police. He was also worried the shooters might have accomplices in the area, and he was afraid of having to become a witness in the case. At trial, K.W. identified Torres and Vidrio as the shooters. He

---

[4]When K.H. spoke with police, he stated that the shorter of the two men spoke. Police described Ortega as 5'6" tall, and Torres as 5'9" tall and heavier.

[5]K.W. told police that the man asked, "you all north bay?" At trial, K.W. explained that he did not know what "Norte" meant at the time, as he was relatively new to the area and uninformed about gangs. He learned after the shooting that the incident may have been gang related and that R.E. was a Norteño. K.W. testified that Padilla was not a Norteño.

acknowledged he did not identify either of them when asked by police shortly after the incident. He testified he was about 85 percent certain that Torres and Vidrio were the shooters.

A resident of the Rocky Hill neighborhood testified that at about 7:40 p.m. on March 5, 2010, he was at home playing with his children when he heard gunshots and saw two men unloading two guns. The resident ran after the men as they ran up a hill and got into a white car with tinted windows that was parked almost a block away from where the men had been shooting. Later, the police showed the resident a car, which the resident positively identified as the white car that the men jumped into at the scene of the shooting.

Vacaville Police Officer Stuart Tan, who was on duty in an undercover capacity on the evening of March 5, 2010, testified that he heard 10 to 15 gunshots from two different guns as he walked to his unmarked vehicle. He then heard a dispatch call that there had been a shooting, and that the suspect vehicle was a white Chevy Impala (the Impala) with tinted windows. Tan drove to an onramp to Highway 80 looking for a car that matched the description. When he saw the Impala go by in the fast lane of the freeway, Tan merged onto the freeway to catch up to it, get a license plate, and see who was inside. Tan saw three individuals in the car. Tan's car was not equipped with emergency lights or equipment so he was unable to pull the Impala over, but he watched as marked patrol vehicles caught up. The patrol vehicles and the Impala all exited the freeway at the Airbase Parkway exit. The Impala drove at least 45 miles per hour through a residential neighborhood before crashing into a small retaining wall at the side of a house.

The occupants ran off. The rear-seat passenger, who was identified as Torres, did not obey commands to stop and continued to fight after police caught up with him, but was eventually subdued and handcuffed. A loaded magazine was found in the Impala where Torres had been sitting; no weapons were found on him. The front seat passenger, identified as Ortega, was found in a garbage can with the assistance of a canine. Next to

5

him in the garbage can was a black hooded sweatshirt.  The driver of the Impala, identified as Vidrio, was also stopped and a search of his person revealed no weapons.

Police searched the Impala and found a black wool ski mask in the passenger door, two sets of gloves and two cell phones, and a magazine for a .9mm firearm with four bullets in it.  Police found a magazine for a .9mm Taurus handgun with 12 rounds in it in the front yard where the Impala crashed.

Vacaville police officers testified that bullet casings were scattered along the sidewalk at the scene of the shootings—.9mm and .45 caliber casings from two different semi-automatic weapons.  An expert in ballistics and crime scene analysis testified that the .9mm cartridge casings were fired from the Taurus .9mm semi-automatic pistol that was recovered.  No firearm was available with which to compare the .45 caliber bullets that had been fired.  An expert in gunshot residue received samples from the two sets of gloves that were found in the Impala and concluded there were particles of gunshot residue on both sets.  DNA evidence established that Torres and Ortega had worn the gloves.

Ortega, who was 21 years old at the time of the incident, testified that he joined a Sureño gang when he was 13 years old and in foster care, and that his nickname was "Drifter" because he was always in a different home.  In March 2010, he was living with Torres because he had nowhere else to live.  Torres was not a gang member.  Ortega testified that on March 5, 2010, he received a call from his cousin, Guizar, who was crying and said he had been beaten up and jumped by Norteños.  Guizar told Ortega that he was being threatened by Norteños and that he wanted Ortega to come and get him out of the Rocky Hill neighborhood.  After receiving the call, Ortega called Vidrio and told him to come pick him up.  He also asked Torres to join him and Vidrio.  Ortega testified that he asked Torres to come along because Torres was his friend, and also because he thought that taking a non-gang member with him would help prevent the situation from "escalat[ing]" into a "Sureño-Norteño thing."  Ortega brought a gun with him because he always carried a gun for protection.  He had no intentions on using it, but he "felt like [his] life [was] in danger."

6

Ortega testified that he told Vidrio how to get to Rocky Hill, and where to park the car. Ortega sent a text message to Guizar asking him where "they" were. He explained at trial that the "they" in the text message referred to the Norteños who were threatening Guizar; he wanted to know where they were so that he could avoid them. When asked, "So . . . you're going to look for your cousin. Why didn't you ask your cousin in these text messages where he was at?", Ortega responded, "Because I thought I knew where he lived, because I kind of knew where he lived at, so I was just going off of what I was remembering. . . ." Ortega testified that he and Torres got out of the car to look for Guizar. They walked to the bottom of a hill and began to walk back toward where Vidrio had parked the car, when he heard someone yell, "[w]ho the fuck are you?" Knowing he was in enemy territory, Ortega put his hooded sweatshirt on so that the Sureño tattoos on his neck would not be visible. He stepped back and answered, "[w]ho are you."

Ortega testified that the person doing the talking stood out to him and appeared to be very aggressive. He answered Ortega's question by saying, "Rocky Hill," which Ortega took as a challenge and a threat. Another one of the three individuals said "yeah." The person who said, "yeah" had his hand hidden, as if he were holding a gun, then made a sudden move like he was pulling out a gun. Ortega was scared and shaken when he saw this, and started shooting. Ortega testified, "I felt like I had to pull my gun before it was pulled on me. So I felt like my life was in danger." After emptying his gun, he ran back up the hill to Vidrio's car, got into the car, and told Vidrio to "go." Ortega told Vidrio that he thought he had "hit" someone because he saw someone fall and get back up and run away after the shooting stopped. The police pursued him, Torres, and Vidrio, and the chase came to an end when Vidrio's car crashed. Ortega attempted to dispose of the gun by throwing it away after the crash.

Ortega initially told police he was not involved and did not know what anyone was talking about. Then he said he did not know about the gun, even though he did. Later in the interview, he started to talk about the phone call from Guizar and going to Vacaville. He lied to police for most of the interview and failed to mention self-defense because he lied about many things and did not know the law. He testified that he lied to get the

7

interview over with, and that he kept changing the lie. When he told police that others "banged on" him, he did not mention self-defense. He repeatedly tried to end the interview. Ortega told his ex-girlfriend in a phone call that he need to pray to God for what he had done.

Torres called Dr. Robert Shomer as an expert in eyewitness identification. Shomer testified that under stress, one's process of perceiving and recording in memory does not work as accurately as they do in calm situations. Beyond 24 hours, inaccuracy in identification rises tremendously, and the presence of guns raises the stress level. He testified that if there is a hostile interaction, "there's a tremendous chance of misperception and misinterpretation of what's going on."

Torres, who was 20 years old at the time of the incident, also testified in his own defense. He testified that he grew up in an area with gang members and had friends who were Sureño or Norteño gang members, but that he had never been in a gang. In March 2010, Ortega was living in Torres's home. Torres knew Ortega was a Sureño, but Torres had never committed any crime with gang members, had never done gang graffiti, and had never gone to gang functions. On March 5, 2010, Ortega asked Torres if he would go with him to Vacaville to pick up his cousin, Guizar, who had been jumped. Torres did not know Guizar but agreed to go. They got in Vidrio's car and drove to Vacaville. Torres was not familiar with the Rocky Hill neighborhood and did not think there would be a fight or a confrontation.

Ortega gave Vidrio directions and they drove around an apartment complex two or three times without seeing anyone. Torres thought Ortega tried to call Guizar, but that he could not reach him. Torres suggested they go home but Ortega told Vidrio to stop the car, and Torres and Ortega got out of the car. They saw a group of people, and Torres was a little scared and walked back a little bit. Someone asked, "Where the fuck are you guys from?" Torres thought Ortega said, "Bay Area," and that one of the others said, "Rocky Hill Posse." He also heard someone say "Yeah."

One of the men came toward them with his hand inside his sweater. He pulled his hand out, and Torres thought he was going to pull out a gun. Torres turned his back and

8

began to get ready to run.  He heard a gunshot, pulled out his gun, and shot as he ran.  He testified he tried to shoot it in the air because "I didn't want to hit nobody."[6]  He thought if he fired his gun, the others would get scared and stop firing.  He ran to the car and Vidrio drove off.  Torres threw his gun out the window because he was scared and did not want to get caught with it.  He testified that he was carrying a gun that day for safety because he had just been jumped, robbed at gunpoint, and shot at by gang members.  He identified the .9mm gun as his.

Vidrio testified he met Ortega in middle school or high school and knew Ortega was a Sureño.  Vidrio had known Torres for three years; they would smoke marijuana together.  On the afternoon of March 5, 2010, he and Ortega made arrangements to go smoke marijuana "on the freeway."  Vidrio drove to Torres's place and picked Ortega and Torres up.  As Vidrio drove, Ortega told Vidrio to get off the freeway in Vacaville and gave him directions.  Vidrio was not a gang member and did not know what Ortega and Torres were going to do.  He did not see either Ortega or Torres with guns, and neither was wearing gloves or a hood.  Once they arrived in the location Ortega had directed him to, Ortega and Torres left the car.  As Vidrio was about to make a phone call, he heard gunshots, and Ortega and Torres ran up to the car.  Ortega said, "I got somebody.  I think I shot somebody," and told Vidrio to "Go, go."  Vidrio saw Ortega with a gun.  Vidrio did not hear Torres say anything.  When Vidrio heard sirens, he did not pull over because Ortega had a gun and he was scared for his life.  His car crashed and he took off running but eventually surrendered.

Michelle Vega, Ortega's sister, told police that she received a phone call from Ortega at about 7:04 p.m. on March 5, 2010.  He appeared to be crying and upset, and she could hear police sirens in the background.  He said he was going away for a long time, that it was "over" for him, and that he was going to prison.  He also said the whole thing was Guizar's fault.

---

[6]A police officer testified that a .9mm hole was found in the grill of a Ford Expedition, and that if a .9mm bullet had been fired into the air, it would not have gone into the vehicle's grill.

9

## I. Constitutional Rights

### A. Background

After his arrest, Ortega waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and was interviewed by police. At trial, Ortega testified, among other things, that he shot the victims in self-defense. During cross-examination, the prosecutor asked Ortega about statements he made during the police interview and asked, "You haven't told anyone until today that you were trying to defend yourself, correct?" The trial court overruled an objection and Ortega responded, "Well, yes, because when I said they were banging on me, that's where that came in." The prosecutor asked, "And then you responded to say it was in an attempt to scare [the three individuals]?" Ortega responded, "Yeah, because I'm not . . . a killer. I didn't mean to kill nobody. So I wasn't trying to kill nobody. I was just trying to get out of there for my safety."

The prosecutor then asked, "And didn't you think it was important, if you were acting in self-defense, to tell the police the truth?" Ortega responded, "I was lying to them about a whole bunch of different things . . . I didn't know the law or nothing like that. I knew what I acted on, but I didn't elaborate on that. No I didn't." The prosecutor asked, "Did you think to tell the police officers that were interviewing you that you were acting in self-defense?" Ortega responded, "No." The prosecutor asked, "And you never said that it was in self-defense?", and Ortega responded, "Well, I told them that they banged on me, and that kind of went that way. I didn't elaborate. He didn't even ask me, 'What do you mean by "banged on me"?' He didn't ask me what were they doing or anything like that. So I didn't know that, just by them doing that and the way I felt, that that was self-defense."

In closing, the prosecutor argued, "So this picking up Alex [Guizar] story is a way to get you to understand why they were in Norteño territory. It's a lie. It's a false statement. It's a way to make the evidence fit their story. Because they never once told Sergeant Dye that—talking about Mr. Ortega, he never says, 'Hey, I was just going over there to pick up Alex.' I asked him, he says, 'Yeah, I was—I was tired of talking to those

cops.' Yeah, 'Well, you never told them that it was self-defense either, did you?' 'No, I was tired of talking to them.' Well, you know what? If you were completely innocent of this crime, because this is a self-defense crime, and you were just over there picking up your cousin, minding your own business, that would be the first thing you would say." The trial court overruled Torres's counsel's objection that the argument was irrelevant. The prosecutor continued: "And then I asked Mr. Ortega on the stand, 'Did you ever tell anyone, prior to this trial, that this was self-defense in law enforcement? Did you ever tell one police officer that this was self-defense?' 'Nope. Huh-uh.' "

Ortega's counsel said in closing: "Ms. Ray [the prosecutor] said that if he was acting in self-defense, why didn't he tell . . . Detective Dye . . . when he was being interrogated? And Mr. Ortega tried to explain that to you, about what was going through his mind. And what we know is all of the events of that day . . . he's being gang-banged on, and then he sees this movement, and then he's firing a gun, emptying his gun. He gets into a high-speed chase. They crash. He runs. He hides in a garbage tote. It's kicked over. A dog, a canine grabs the top of his head . . . what it goes to is Mr. Ortega's state of mind that night when he talked to the police . . . [¶] . . . And he's taken to the hospital. Then he's taken to be interrogated. All that is happening. And you heard that he kept saying, 'I wanted it to end. I said I didn't want to talk any more. I put my shirt over my head,' and basically crawled inside of his shirt. He didn't want to keep talking to the police officer any more. He would say parts of it. He would say that they gang-banged on him. . . ."

### B. Contention

### 1. Doyle

Ortega contends the trial court violated his constitutional rights by allowing the prosecutor to question him—and argue—about his failure to claim self-defense before he testified at trial. He relies on *Doyle v. Ohio* (1976) 426 U.S. 610, 619 [96 S.Ct. 2245] (*Doyle*) in asserting that "it is fundamentally unfair to allow an arrested person's silence following the giving of his [*Miranda* rights] to be used to impeach an explanation subsequently offered at trial." Ortega acknowledges that his counsel did not object on

11

this ground and asserts his counsel was ineffective for failing to do so. Assuming, without deciding, there was no forfeiture, we conclude the contention fails on the merits.[7]

In *Doyle*, the United States Supreme Court held it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. (*Doyle*, *supra*, 426 U.S. at p. 619 [96 S.Ct. at pp. 2245–2246].) It is settled, however, that *Doyle* does not apply when a defendant presents exculpatory testimony at trial that is *inconsistent* with a voluntary post-*Miranda* statement. (*Anderson v. Charles* (1980) 447 U.S. 404 [100 S.Ct. 2180] (*Anderson*).) In *Anderson*, a murder defendant waived his *Miranda* rights and told police that he had stolen the victim's car from a particular location. (*Id.* at p. 406 [100 S.Ct. at pp. 2180–2181].) At trial, he testified that he stole the car from a different location, and the prosecutor asked, " 'Don't you think it's rather odd that if it were the truth[,] that you didn't come forward and tell anybody at the time you were arrested, where you got the car?' " (*Ibid.*)

The United States Supreme Court held: "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson*, *supra*, 447 U.S. at p. 408 [100 S.Ct. at p. 2182]; *People v. Collins* (2010) 49 Cal.4th 175, 203; *Wainwright v. Greenfield* (1986) 474 U.S. 284, 292 [106 S.Ct. 634, 639] ["The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony."]; *Fletcher v.*

---

[7]In light of our conclusion that the contention is without merit, we also conclude that Ortega's ineffective assistance of claim fails. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [to prevail on a claim of ineffective assistance of counsel, a defendant must show both defective performance and resultant prejudice].)

12

*Weir* (1982) 455 U.S. 603, 603–604, 607 [102 S.Ct. 1309, 1310] [refusing to extend *Doyle* to cover prosecutor's comment on post-arrest silence by defendant in the presence of the police when they had not given him *Miranda* warnings].)

Similarly, here, *Doyle* does not apply because the prosecutor, through her questioning and argument, was *not* referring to Ortega's exercise of his right to remain silent, but to the actual statements he made to police after *waiving* his *Miranda* rights—statements the prosecutor argued were inconsistent with what he later testified to at trial. In the same way the prosecutor in *Anderson* asked, " 'Don't you think it's rather odd that if it were the truth[,] that you didn't come forward and tell anybody at the time you were arrested, where you got the car?' ", the prosecutor in the present case questioned why Ortega did not tell police during the many hours of questioning that he shot in self-defense, if that were truly what had occurred. (*Anderson*, *supra*, 447 U.S. at p. 406 [100 S.Ct. at pp. 2180–2181].) The prosecutor also pointed out that Ortega told police that he shot the three individuals "in an attempt to scare them," thereby trying to demonstrate for the jury the dramatic inconsistency between what Ortega told police and what he was telling the jury at trial.

Ortega suggests that *Anderson* is inapplicable because in his case, "there is evidence in the record that the police did not obey a defendant's invocation of his right to silence. . . ." It was, however, undisputed that Ortega waived his *Miranda* rights and gave a statement to police. Although Ortega testified that he told police on multiple occasions that he wished to stop talking, the defense never challenged the admissibility of his statement on that ground, and therefore forfeited the claim. Moreover, the record on appeal includes only references to isolated portions of Ortega's interview; there is nothing that shows what points, if any, during his statement Ortega allegedly invoked his right to remain silent. Thus, even if we were to conclude that the issue is preserved for appeal, we would be unable to conclude that Ortega unambiguously invoked his right to silence during questioning. (See *Berghuis v. Thompkins* (2010) 507 U.S. 370, 381 [130 S.Ct. 2250, 2259–2260] [to cut off questioning by law enforcement officers, an accused must unambiguously invoke his right to remain silent].)

## *2. Sixth Amendment and Evidence Code Section 954*

Without much argument or citation to relevant authority, Ortega contends the prosecutor's questions and comments also violated his constitutional rights under the Sixth Amendment and his statutory right under the Evidence Code to refuse to disclose a confidential communication between himself and his counsel. Assuming there was no forfeiture, we conclude the contention fails on the merits.

As noted, the prosecutor asked Ortega, "You haven't told anyone until today that you were trying to defend yourself, correct?" Ortega's claim on this issue is not entirely clear, but it appears he is arguing that this question violated his rights because it forced him into the unfair choice of either giving up his attorney-client privilege and revealing what he told or did not tell counsel regarding self-defense, or falsely stating he had not told anyone, if in fact he had told counsel. The record shows, however, that the prosecutor asked this question in the midst of a series of questions relating to statements Ortega made to police during the interview. For example, the prosecutor had just asked Ortega about the various statements he had made to police, and had asked, "But you didn't say that you were trying to defend yourself, correct?" Ortega responded, "No, I didn't." The jury therefore would have reasonably understood the prosecutor's question to be referring to Ortega's failure to raise a self-defense theory during the police interview. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [when evaluating comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion].)

Ortega's response to the prosecutor's question shows he also understood the question as referring to statements he made during the police interview: "Well, yes, because when I said they were banging on me, that's where that came in." The prosecutor then asked, "you never said in your interview . . . that you had any reason to shoot at the victims except for to scare them, correct?" Ortega responded, "Correct. But when they started banging on me, that's why I pulled out my gun, because I was trying to

14

get out of there." We conclude there was no violation of Ortega's constitutional or statutory rights.

### 3. Harmless Error

We further conclude that even if there was error relating to the prosecutor's questions or comments during closing argument, any error was harmless beyond a reasonable doubt, because without any of the challenged questions or comments by the prosecutor the record would have been no better for Ortega, and the jury's verdicts would have been no different. Without objection and before any of the questions or comments Ortega now challenges occurred, the prosecutor asked him: "But you didn't say that you were trying to defend yourself, correct?" Ortega answered, "No, I didn't." That interchange alone permitted the prosecutor to argue to the jury that it should discredit Ortega's testimony because he had not told his self-defense story to the police.

Any error was also harmless because the evidence overwhelmingly refuted self-defense regardless of Ortega's statement to the police. There was evidence that Ortega, armed with a shotgun, went to Rocky Hill in order to confront the Norteños who had threatened his cousin. He testified that he went to Rocky Hill to pick up Guizar, but he sent a text message to Guizar asking where "they," i.e., the Norteños, were, not where Guizar was. He engaged a driver for a quick getaway and brought a fellow gunman with him. He wore nondescript clothing and covered his hands with gloves, and engaged the victims by pretending to be Norteño. He opened fire in close range, emptying his gun. He and Torres killed the one person in the area they had a reason to kill if they were indeed on the retaliatory mission the evidence suggested—the person who had fought with Ortega's cousin that afternoon. After the shooting, Ortega spoke to both his sister and an ex-girlfriend about the incident, but there was no evidence he mentioned self-defense to either of them.

Ortega asserts that the length of jury deliberations—six court days—indicated that the case was a close one. Even if six days of jury deliberations after a two-week trial can be considered lengthy, that does not show that the jury believed the self-defense claim was plausible. The jury ultimately found against the prosecution on the questions of

15

whether the murder and attempted murders were premeditated, whether Vidrio was an accomplice, and whether the crimes were gang related. Accordingly, the lengthy jury deliberations suggested that the jury struggled with those questions, not necessarily with self-defense.

## II. Prosecutorial Misconduct

### A. Ortega's Claim of Prosecutorial Misconduct

Ortega contends the prosecutor committed misconduct by questioning Ortega and commenting on his failure to claim self-defense, and by disparaging defense counsel. We reject the contention.

The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 820.) As a general rule, a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Samayoa, supra,* 15 Cal.4th at p. 841.) In addition, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*Ibid*.)

In light of our conclusion that the prosecutor's questioning and argument about Ortega's failure to claim self-defense before trial was not improper, we conclude those acts by the prosecutor did not constitute misconduct. As to his claim that the prosecutor improperly disparaged counsel, we find the contention is without merit. Ortega asserts

the prosecutor "disparaged defense counsel" by arguing to the jury "that the defendants had 'two years' to 'backfill their story;' " and " 'two years to think about what they were going to say . . . to look over the evidence and make decisions on what they were going to tell you.' " Ortega argues that the prosecutor essentially told the jury that "appellant, with the help of defense counsel, was fabricating evidence and suborning perjury," since defense counsel was "the only person who could provide appellant with the evidence" and who "could 'tell' appellant what to say . . . ."

Assuming there was no forfeiture, we conclude the contention lacks merit because there is no reasonable likelihood that the jury misapplied the law due to the prosecutor's statements. (See *People v. Samayoa, supra,* 15 Cal.4th at p. 841.) [a prosecutor's comments before the jury do not rise to the level of misconduct absent a reasonable likelihood that the jury "construed or applied any of the complained-of remarks in an objectionable fashion"].) In *People v. Zambrano* (2007) 41 Cal.4th 1082, 1154, disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at page 421, footnote 22, the prosecutor called defense counsel's argument "a 'lawyer's game' and an attempt to confuse the jury by taking the witness's statement out of context." The court concluded the argument was permissible because it "was aimed solely at the persuasive force of defense counsel's closing argument[] and not at counsel personally." (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1155.)

Similarly, here, the prosecutor did not attribute the argument she criticized to defense counsel. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 647.) The prosecutor's statement that the defendants had two years to contrive their stories implied nothing more than that the jury should disbelieve the defendants because they had all the time they needed to tailor their stories to the evidence against them. The argument neither said nor implied anything about defense counsel's role. There was no misconduct.

17

## B. Torres's Claim of Prosecutorial Misconduct

### 1. Background

During closing, the prosecution argued, "Let's take some of the defense witnesses, and we're going to view all of them with the same critical eye. [¶] Who has a motive to lie in this case? Who had the time to, quote, backfill their story, as Dr. Shomer told you. Well, I don't know. The defendants had two years to do that, because they surely didn't tell this version of the story that you heard to the police when they were interviewed on the day of the crime. . . ." Torres's counsel and Vidrio's counsel each objected without stating a reason, and the trial court overruled the objections. The trial court overruled two additional objections from Vidrio's counsel—"[m]isstates [sic] facts not in evidence" and "[p]rosecutorial misconduct"—and denied a request from Vidrio's counsel for a limiting instruction. The prosecutor continued, "So you take into consideration who was telling you the truth and who had motive to not tell you the truth. The defendants are the only ones that had a motive to not tell you the truth. They're on trial there. They had two years to think about what they were going to say, two years to look over the evidence and make decisions on what they were going to tell you."

### 2. Contention

Torres contends that because no evidence was presented to the jury that he had even spoken to police, the prosecutor committed misconduct by implying that he had told a different story to police when he was interviewed on the day of the incident.[8] He argues that the prosecutor, by her statement, essentially, and improperly, "informed the jurors that she had information undisclosed to them." Assuming Torres did not forfeit this contention by failing to object on the ground upon which he challenges the statements on appeal, we conclude it fails on the merits.

---

[8]According to the probation report, Torres initially waived his *Miranda* rights and made a statement to police before he ended the interview by invoking his right to have a lawyer present. In his statement to police, Torres said he did not know the co-defendants and was merely hitchhiking to Fairfield. We do not find in the record any indication that Torres's statement was introduced into evidence.

As noted, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly v. DeChristoforo*, *supra*, 416 U.S. at p. 647.) Here, the prosecutor's undifferentiated reference to "the defendants" was ambiguous. It could have meant two of the defendants, or all three. The trial court properly instructed the jury to decide the facts based only on the evidence, which the court defined to specifically exclude anything the attorneys said in their closing arguments. Having heard only evidence of Ortega and Vidrio being interviewed on the day of the crime, and having heard no evidence that Torres was ever interviewed, a reasonable jury would have determined that the prosecutor was referring only to Ortega and Vidrio, and not Torres.

The record supports a conclusion that the jury would have been particularly likely to interpret the prosecutor's argument to refer only to Ortega and Vidrio because, after arguing "the defendants" told the police a different story from what they said at trial, the prosecutor explained, "Mr. Ortega never tells the police that he was acting in self defense. [¶] Mr. Vidrio never tells the police that he's just out for a ride . . . ." She made no mention of Torres as having spoken to the police, thereby suggesting that it was Ortega and Vidrio, and not Torres, to whom the prosecutor was referring when she said "the defendants." In addition, the trial court instructed in one of its jury instructions: "You have heard evidence that *defendants Rudolfo Ortega and Jesus Vidrio* made statements before trial. You may consider that evidence only against the defendant who made the statement and not against any other defendant." (Italics added.) Another jury instruction stated in part: "If *the defendants Rudolfo Ortega and/or Jesus Vidrio* made a false or misleading statement before this trial . . . knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt . . . ." Those instructions also assisted the jury in reasonably determining that the statements to which the prosecutor referred must have been statements made by Ortega and Vidrio, and not Torres.

19

Moreover, any error was harmless under any standard because the evidence refuted Torres's claim of self-defense as overwhelmingly as it did Ortega's. Torres accompanied his housemate, a known Sureño gang member, to a Norteño area in Vacaville, carrying a loaded gun, yet claimed he did not think there would be a fight or a confrontation. He believed they were there merely to "pick up" Guizar, and that he did not realize Ortega was armed. Torres testified that he began shooting only after he had his back turned and heard a gunshot, and thought it was Padilla who was shooting. He testified that he shot in the air, but there was evidence that multiple bullets from the gun that he admitted he carried with him that day were found in areas, including the grill of a car, that the bullets would not have gone into if they had been fired into the air. Given these incongruities, and the overwhelming evidence against him, any error would have been harmless beyond a reasonable doubt.

### III. Exclusion of Evidence

Both appellants contend the trial court prejudicially erred by excluding defense-proffered evidence that R.E. possessed a gun on two dates after the incident occurred—April 19, 2011 and January 1, 2012—and therefore "has the character of a gun carrying gang member."[9] We reject the contention.

Evidence Code section 1103, subdivision (a)(1), permits a defendant to "offer[] evidence regarding the character or trait of a victim 'to prove conduct of the victim in conformity with the character or trait of character.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827.) Evidence Code section 352 permits a trial court to exclude evidence that would confuse the issues at trial, unduly consume time, or be more prejudicial than probative. An appellate court reviews such a ruling deferentially,

---

[9]Although the trial court referred to its ruling as "tentative" and informed the parties that it may revisit the issue at a later date depending on what facts were presented at trial, there is nothing in the record indicating the court made any "final" ruling regarding the admissibility of this evidence. We therefore consider the trial court's "tentative" decision excluding the evidence to be the court's final determination on this matter.

20

overturning it only upon finding that the trial court abused its discretion. (See, e.g., *People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

We conclude there was no error because the proffered evidence was not relevant. Appellants assert that the proffered evidence could have assisted the defense in demonstrating that they believed that one of the three individuals—Padilla, K.H., or R.E.—had a gun, and that they therefore reasonably acted in self-defense. Ortega relies on *People v. Shoemaker* (1982) 135 Cal.App.3d 442, but that case refutes appellants' claim. The court in that case stated, "Character at an earlier or later *time* than that of the deed in question is relevant *only on the assumption that it was substantially unchanged in the meantime*, *i.e*. the offer is really of character at one period to prove character at another, and the real question is of relevancy of this evidence to prove character, not of the character to prove the act." (*Id.* at p. 447, italics added.) Here, the proffered evidence showed at most that R.E. was "a gun carrying gang member" *in 2011 and 2012*, after the charged crimes. R.E.'s father reported to probation after the incident, "even though I didn't lose my son, I lost my son," referring to how R.E.'s personality, outlook on life, and behavior, had changed after the incident in which he was shot and severely injured by appellants, at least one of whom was a Sureño. The proffered evidence showed nothing more than that R.E. had become "a gun carrying gang member" by 2011 and 2012, not that he was more likely to have been one at the time of the shooting in 2010. In other words, the evidence was irrelevant because the defense failed to show that R.E.'s character was "substantially unchanged" after—or by—the shooting. (*Id.* at p. 445.)

Even assuming the evidence had some relevance, we would conclude it was only minimally relevant, and agree with the trial court that any probative value was far outweighed by its potential for confusing the jury and consuming time as the parties would have had to adjudicate the facts of the subsequent events. Accordingly, the trial court did not abuse its discretion in excluding the evidence as substantially more prejudicial than probative. (See Evid. Code, § 352.) Because there was no error under state law, appellants' constitutional claims also fail. (See *People v. Linton* (2013)

56 Cal.4th 1146, 1202.)  Finally, we conclude that any error was harmless because, as stated above, there was overwhelming evidence that appellants did not act in self-defense.

### IV. Cumulative Error

Both appellants contend there was cumulative error.  In light of our conclusion that there was no error, or that even if there was error, there was no prejudice, we conclude there was no cumulative prejudicial error.  (See *Beardslee v. Woodford* (9th Cir. 2004) 358 F.3d 560, 591 ["Each of these potential errors is harmless individually. Although they carry slightly more weight cumulatively, the aggregate errors still fall short of causing a substantial impact on the verdict or the denial of a  fundamentally fair trial"]; *People v. Rountree* (2013) 56 Cal.4th 823, 860 [no cumulative prejudice where "there was no error to accumulate."]; *People v. Homick* (2012) 55 Cal.4th 816, 875, fn. 35 [rejecting a claim of cumulative prejudice by finding that "[t]he occasional evidentiary error defendant points to could not have had a prejudicial impact sufficient to require reversal"].)

### V. Cruel and Unusual Punishment

Torres challenges his sentence of 86 years and four months to life in prison on the ground that it constitutes cruel and unusual punishment under the federal and state constitutions.  We reject the contention.

When a defendant over the age of 18 commits murder, a term-of-years sentence that is the functional equivalent of life without parole is not necessarily cruel and unusual punishment under the federal constitution or cruel or unusual punishment under the state one.  (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.)  "To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts.  The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities.  [Citation.]  If the penalty imposed is " 'grossly disproportionate to the defendant's individual culpability' " [citation], so that the

punishment " ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' " [citation], the court must invalidate the sentence as unconstitutional." (*People v. Lucero* (2000) 23 Cal.4th 692, 739–740.)

Torres notes only the factors arguably in his favor:  that he was 20 years old at the time of the crimes, did not intend to kill, and had no previous criminal convictions.  He fails to mention that there was ample evidence that the shootings were a planned, surprised attack that killed one teenager, severely wounded another, and narrowly avoided injuring a third.  There was evidence that Torres fired his gun approximately ten times, and not in the air as he claimed he had done.  Given the severity of the injuries and death he caused, and the further injuries he could have caused, a de facto sentence of life without parole is not grossly disproportionate to his culpability.  (See *People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390–1391 [sentence of life without parole for second degree murder of peace officer and injury to others not cruel and unusual punishment].)

## DISPOSITION

The judgment is affirmed.

_____
McGuiness, P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

23